**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| In Re: | Case No. 11-07682-swd |
| | Chapter 7; Filed 07/19/2011 |
| WILLIAM W. MORRIS and | Hearing Scheduled: 08/08/2012 at 10 a.m. |
| JACQUELINE L. MORRIS, | in Kalamazoo, Michigan |
| | HONORABLE SCOTT W. DALES |
| Debtors. | Bankruptcy Judge |
| _____/ | |

**CHAPTER 7 TRUSTEE'S RESPONSE TO KELLOGG COMMUNITY**
**FEDERAL CREDIT UNION'S OBJECTION TO TRUSTEE'S MOTION**
**TO SELL INTEREST IN LAND CONTRACT AND PROPERTY**

NOW COMES Stephen L. Langeland, Chapter 7 Trustee (the "**Trustee**"), through his attorneys, Warner Norcross & Judd LLP, and in response to the objection filed by Kellogg Community Federal Credit Union to the Trustee's Motion to Sell Interest in Land Contract and Property, states as follows:

1. The Debtors filed their voluntary Chapter 7 Petition on July 19, 2011.

**ANSWER**:   Admitted

2. Based on proofs of claim filed as of this date, the Credit Union's unsecured claim constitutes approximately 98% of all unsecured claims filed.

**ANSWER**:   Admitted.

3. The Trustee's Motion seeks Court authority for the Trustee's sale of: (a) the estate's interest in a Land Contract; (b) the estate's interest in the property described in the Land Contract; (c) the estate's right to receive payments under the Land Contract; and (d) the estate's interest in all causes of action to reform the Land Contract, all for $20,000.

**ANSWER**:   Admitted, although the Trustee is informed and believes that there will be competitive bidding at the sale hearing.  Therefore, the Trustee believes that the purchase price will exceed $20,000.

4. The Debtors' Schedule B lists the Land Contract receivable as an asset of the estate, and claims a balance of $441,376.45 "on the building" and $48,941.00 "on the liquor license".

**ANSWER**: Admitted.

5. The Land Contract is a September 24, 2007 $500,000 Land Contract between Hots, Inc., the land contract seller, and HOA Enterprises, Inc., the land contract buyer (attached at Tab A).[1] Upon information and belief, as of the September 24, 2007 date of the Land Contract, William Morris was the sole shareholder of Hots, Inc. Further, upon information and belief, Steven Titus was the sole shareholder of HOA Enterprises, Inc.

**ANSWER**: Denied as untrue. By way of further answer, the Trustee believes that the sole shareholder of Hots, Inc., on September 24, 2007, was Steven Titus.

6. The $500,000 Land Contract relates to a "gentlemen's club" located at 948 North Raymond, Battle Creek, Michigan 49014, with an SEV of $112,650 (see attached Tab B).

**ANSWER**: Admitted.

7. Under the terms of the $500,000 Land Contract, HOA Enterprises, Inc. paid Hots, Inc. $50,000 upon execution. The $450,000 balance was payable at 11% interest in monthly payments of $4,285.46, a 30-year amortization. Initially, the $500,000 Land Contract included a three-year balloon, i.e., the entire outstanding balance of the $500,000 Land Contract became due and payable on September 24, 2010. By March 2010 and March 2011 Amendments, the balloon payment date was extended to September 24, 2025, and the interest rate reduced to 7%.[2]

**ANSWER**: Admitted.

---

[1] The Land Contract was amended in March 2010 and March 2011. Both amendments are also attached at Tab A.
[2] March 2011 Amendment also provides for a 40% discount if paid in full by March 23, 2012, with a right to extend the deadline for an annual fee of "5%".

8. Upon information and belief, all pre-petition Land Contract payments were made directly to William Morris for the almost four-year period prior to the Petition Date.

**ANSWER**: Admitted upon information and belief.

9. Further, the Trustee's Motion suggests that post-petition payments were made either to the Trustee or Morris until HOA Enterprises, Inc. ceased making payment in January 2012. Paragraph 4 of the Trustee's Motion asserts that the $500,000 Land Contract is in arrears for non-payment of the January 24, 2012 payment and payments thereafter.

**ANSWER**: Denied as untrue. The Trustee has received no Land Contract payments, and the Trustee believes that William Morris also received no Land Contract payments post-petition. The reason for this was that a credit was given against payments due under the Land Contract for certain parking lot improvements made to the Land Contract property.

10. Even though Hots, Inc. was the seller under the $500,000 Land Contract, the Land Contract buyer made payments directly to Morris and the Trustee, suggesting that Hots, Inc. assigned to Morris all rights to receive payments under the $500,000 Land Contract.

**ANSWER**: Denied as untrue. By way of further answer, the Trustee further believes that Land Contract payments were made to William Morris pre-petition. However, the Trustee has received no payments.

11. The Trustee's Motion seeks Court authority for the Trustee's sale of the estate's right to receive the $441,376.45 balance on the $500,000 Land Contract for $20,000.

**ANSWER**: Admitted, although the Trustee believes that there will be competitive bidding at the sale hearing.

12. The Trustee's Motion to sell for $20,000 apparently is based on his assessment that the $500,000 Land Contract documents are flawed and must be reformed.

**ANSWER**: Denied as untrue. By way of further answer, the Land Contract property consists of a cinder block building in bad condition. Further, there are currently $13,540.56 in delinquent taxes on the property, and the Trustee believes that 2012 summer taxes have not been paid. It is likely that the property will go to tax sale in March 2013, as the Trustee has no funds to pay the delinquent taxes. The Trustee has visited the business during its peak hours, and found little activity. William Morris has also threatened to take the assets of the business and move to a different location in the event the Trustee seeks to forfeit the Land Contract. In this respect, Mr. Titus indicates that no security agreements were signed, granting to anyone a security interest in those assets. Based upon a financing statement search, the Trustee believes this to be accurate, as no financing statements have been filed other than by First Funds LLC in accounts receivable and tax liens filed by the IRS ($13,620.43) and the State of Michigan ($6,967.54). Finally, if the state court in a reformation action finds that Hots, Inc. continues to be entitled to the property, it is uncertain whether the Trustee will receive any proceeds from the land contract after payment of any creditors of Hots, Inc.

13. Paragraph 11 of the Trustee's Motion assets [sic] that "the shareholder of Hots, Inc. and the shareholder of [HOA Enterprises, Inc.] are the same person", i.e., Titus. The Trustee's claim is based on the apparent fact that, at the same time the September 24, 2007 $500,000 Land Contract was executed, William Morris, the sole shareholder of Hots, Inc., and Steven Titus entered into a stock sales agreement, providing for Morris' transfer to Titus of all of the stock in Hots, Inc. for a purchase price of $50,000, with $100 down.

**ANSWER**: Admitted.

14. There are two "versions" of the stock sales agreement, which are attached at Tabs C and D. Under each "version", the $49,900 purchase price balance was payable at 11%

4

interest in monthly payments of $475.21, a 30-year amortization. Like the Land Contract, the agreement provided for a three-year balloon, i.e., the balance outstanding would be due and payable on September 24, 2010.

**ANSWER**:    Admitted.

15.    Unlike the Land Contract, though, the stock sales agreement provided for a closing following MLCC approval of the stock transfer, and referenced a note, stock pledge, and security agreement relating thereto.[3]

**ANSWER**:    Admitted.

16.    The undersigned contacted the MLCC and learned that the MLCC did not approve the transfer of Hots, Inc.'s stock from Morris to Titus until April, 2009.[4]

**ANSWER**:    Admitted upon information and belief.

17.    Based on the undersigned's conversations with the Trustee and the Trustee's attorney, it is the Credit Union's belief that the Trustee does not have a copy of the closing agenda or other closing documents relating to the $500,000 Land Contract nor does the Trustee have the note, stock pledge, and security agreement described in one of the two "versions" of the stock sales agreement, or any assignment of land contract receivable that may have been executed in April 2009 when the stock sale was completed.

**ANSWER**:    Admitted, although the Trustee believes that there are no other closing documents. The Trustee has made numerous contacts with attorney Don Dickerson requesting a copy of his file, but to date, nothing has been produced. Further, the Trustee believes that there

---

[3] A "flow chart" of the land contract and stock purchase transaction is attached at Tab E.
[4] This is consistent with the fact that Hots, Inc.'s annual reports filed with the state in February 2008 and February 2009 were signed by Morris, as President. A change of resident agent was not filed until July 20, 2009, listing Titus as President.

are no other closing documents other than those attached to the objections filed to the Trustee's motion, based upon information obtained from the attorney for Mr. Titus.

18. Based on the documents now in the Trustee's possession, the transaction is absurd. Why would Morris enter into a $500,000 Land Contract with a $450,000 balance on behalf of Hots, Inc. and, at the same time, transfer all of his stock in Hots, Inc. to the shareholder of the land contract buyer, effectively cutting off his right to receive the Land Contract payments as a distribution from Hots, Inc.?

**ANSWER**: Admitted.

19. The actual Land Contract monthly installment payment flow best evidences the Land Contract seller and Land Contract buyer's mutual intent that the Debtor receive the benefit of the $550,000 transaction — <u>not</u> Steven Titus, shareholder for the Land Contract buyer.

**ANSWER**: Admitted.

20. The Trustee does not disagree with this assessment. Paragraph 13 of the Trustee's Motion states:

> "The Trustee believes that the Land Contract was prepared in error, and that it was intended that William W. Morris was the seller under the terms of the Land Contract or the person entitled to payments under the Land Contract. That fact has been confirmed by virtue of payments that have been made to William W. Morris under the terms of the Land Contract."

**ANSWER**: Admitted.

21. The actual payment flow indicates that Hots, Inc. assigned to the Debtor the rights to the Land Contract payment stream, prior to closing on the Morris/Titus stock sales agreement. That missing assignment document would justify the parties' actual flow of payments for the four-year period prior to bankruptcy.

6

**ANSWER**:    Admitted, although the Trustee believes that there are no missing assignment documents.

22. In the alternative, as suggested at paragraphs 12 and 13 of the Trustee's Motion, perhaps Hots, Inc. intended to convey the real property to the Debtor, with the Debtor then selling the real property on Land Contract. That scenario would also justify the flow of payments over the four-year period.

**ANSWER**:    Admitted.

23. Even if documents do not exist to support Morris receiving the benefit of the transaction, the prospects of a reformation action are very good.

**ANSWER**:    Admitted, although the Trustee does not believe that there is sufficient value in the Land Contract to justify the cost and expense of seeking reformation. See also Paragraph 12 above.

> As is stated in *Collier on Bankruptcy* at ¶ 363.02(4):
>
> In determining whether to approve a proposed sale under section 363, courts generally apply standards to that, although stated variously ways, represent essentially a business judgment test.[54] Some earlier decisions described the standard as one of "good faith" or of whether the transaction is "fair and equitable"[55] or whether the sale is "in the best interest of the estate."[56] However, the more recent cases tend to focus on whether a sale is supported by a sound business reason and is based on a sound exercise of business judgment. The "business judgment" test here differs from the general corporate law business judgment rule, which protects corporate directors from liability where they exercised due care and were not self-interested in the transaction.[57] Here, by contrast, the bankruptcy court reviews the trustee's (or debtor in possession's) business judgment to determine independently whether the judgment is a reasonable one. The court should not substitute its judgment for the trustee's but should determine only whether the trustee's judgment was reasonable and whether a sound business justification exists supporting the sale and its terms.
>
> 54  *See In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (debtor's troubled history, cash sale, unlikelihood of confirmable plan, and creditors' committee support provided sound business justification for sale).
> 55  *See, e.g., In re Phoenix Steel Corp.*, 82 B.R. 334 (Bankr. D. Del. 1987).

7

56  *See, e.g., WBQ P'ship v. Commonwealth of Virginia Dep't of Medical Assistance Servs.*, 34 C.B.C.2d 674, 189 B.R. 97 (Bankr. E.D. Va. 1995).
57  *McMullin v. Beran*, 765 A.2d 910 (Del. 2000).

24. In the alternative, perhaps the stock sale documents signed following MLCC approval of the stock purchase agreement offer the Chapter 7 Trustee a means of generating greater value for the estate without the need for a state court reformation action. For example, if the stock pledge agreement provides that the stock secures both the Land Contract and the $49,900 stock purchase note, the Trustee may notice out a sale of the stock, advising potential bidders that acquisition of the Hots, Inc. stock may entitle the buyer to distribution rights on the $400,000+ balance on the Land Contract.

**ANSWER**:   Admitted, but see Paragraphs 12 and 23 above.

25. Not until the Trustee has all of the transactional documents can the interest(s) of the bankruptcy estate in the Land Contract receivable be clarified, nor can a buyer of the land contract reformation cause of action assess the likelihood of success of such cause of action.

**ANSWER**:   The Trustee does not believe that there are any other transactional documents, but even if there are additional transactional documents, see Paragraphs 12 and 23 above.

26.  Until the Trustee obtains all of these transactional documents, it is premature for the Trustee to sell the estate's interest in the Land Contract, property, and cause of action.

**ANSWER**:   Denied as untrue.

27. To maximize value of this asset and cause of action, the Trustee should first obtain all of the transactional documents.

**ANSWER**:   Denied as untrue.

WHEREFORE, the Trustee requests that this Court deny the objections filed Kellogg Community Federal Credit Union, that the auction sale be permitted to proceed, and that the Trustee be given such other and further relief as this Court shall deem just and proper.

                                                WARNER NORCROSS & JUDD LLP
                                                Attorneys for Stephen L. Langeland

Dated:  August 6, 2012                      By:  /s/ Timothy Hillegonds
                                                   Timothy Hillegonds (P25555)
                                                   900 Fifth Third Center
                                                   111 Lyon Street NW
                                                   Grand Rapids, MI 49503
                                                   thillegonds@wnj.com
                                                   (616) 752-2132

8520610